IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ROBERT J. ZEBROWSKI, ET AL. | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | No. 10-542 |
| EVONIK DEGUSSA CORPORATION | : | |
| ADMINISTRATIVE COMMITTEE, ET AL. | : | |

**MEMORANDUM**

Ludwig, J.                                                               September 10, 2012

This is an ERISA action, 29 U.S.C. §§ 1001-1461.  Jurisdiction is ERISA § 502(e)(1),

29 U.S.C. § 1132(e)(1) and federal question, 28 U.S.C. § 1331.

Defendants move for summary judgment on both the complaint and defendant Evonik

Degussa Corporation Administrative Committee's counterclaim (doc. no. 33).  Fed. R. Civ.

P. 56.  Plaintiffs cross-move for partial summary judgment (doc. no. 38) on defendants'

liability for pension benefits, ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B); violations

of ERISA's anti-cutback rule, ERISA § 204(c)(3), (g), 29 U.S.C. § 1054(c)(3), (g); breach

of fiduciary duties, ERISA § 404(a), 29 U.S.C. § 1104(a); and "other appropriate equitable

relief," ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3).

Plaintiffs are Robert J. Zebrowski, Robert A. Woodruff, and Gregory Bialy, former

executives of RohMax USA, Inc.[1]  According to the complaint, defendant Committee

---

[1] Plaintiffs' relevant employments began at Rohm and Haas Company where they were participants in its pension plans.  In 1996, they became employees of RohMax USA, Inc., which eventually assumed liability for plaintiffs' pension benefits.  Despite subsequent changes in corporate ownership, the benefits remained the same and continued to "mirror" the Rohm and Haas plans.  Undisputed Facts.  (Both sides submitted proposed Undisputed Facts and, in some instances, Responses.  All are cited generally as Undisputed Facts – and some specifically, with paragraph numbers.  Some Responses do not present genuine disputes.)

1

wrongfully denied payment of plaintiffs' vested retirement benefits and violated its duties as administrator and fiduciary of the other two defendants Evonik Degussa Corporation Retirement Plan (pension plan) and Evonik Rohmax USA, Inc. Non-Qualified Pension Plan (top hat plan).[2]  The Committee's counterclaim against plaintiff Zebrowski asserts that a portion of his top hat benefits were overpaid and should be paid back by him – among other requests for equitable relief under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3) (doc. no. 18 at 41-53).

The complaint further alleges:  defendant Committee misinterpreted the top hat plan benefits formula, improperly amended the July 1, 1999 top hat plan document on December 30, 2008, and wrongly construed the formula's factor "B" as an off-set of pension plan lump sum payments that included cost-of-living adjustments (COLAs).  Also, the Committee misinterpreted the top hat and pension plans as a combined "total retirement benefit," which lowered the benefit amounts payable to plaintiffs.  Compl. ¶¶ 26, 30, 37, 41, 48, 53. Moreover, the Committee did so by incorrectly deciding that the addition of COLAs to pension plan lump sums reduced the corresponding top hat lump sums by the same amount. Id.  The complaint avers that using this method to calculate benefits constructively amended

---

[2]  A top hat plan "is unfunded and is maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly trained employees." Goldstein v. Johnson & Johnson, 251 F.3d 433, 435 (3d Cir. 2001) (internal quotation marks and citation omitted); see also ERISA §§ 201(2), 301(a)(3), 401(a)(1), 29 U.S.C. §§ 1051(2), 1081(a)(3), 1101(a)(1).  Top hat plans "are not subject to the funding, participation, vesting or fiduciary standards applicable to other employee benefit plans." Miller v. Eichleay Eng'rs, Inc., 886 F.2d 30, 34 n.8 (3d Cir. 1989) (internal quotation marks and citations omitted).  The plans are covered by ERISA's administrative and enforcement provisions.  In re IT Group, Inc., 448 F.3d 661, 664-65 & n.1 (3d Cir. 2006).

the pension plan in violation of ERISA's anti-cutback rule[3]: "The amendment conditioned receipt of the lump sum Pension Plan benefit on non-receipt of a significant portion of [top hat plan] benefits and thus reduced the value of accrued and protected Pension Plan benefits." Compl. ¶¶ 53, 57. This, essentially, is the parties' dispute.

## I.  Summary Judgment Findings of Fact

1.    Defendant Committee is the administrator and named fiduciary of both the pension plan and the top hat plan and acts as statutory fiduciary of the pension plan. ERISA § 3(16)(A), (21)(A), 29 U.S.C. § 1002(16)(A), (21)(A); ERISA § 402(a), 29 U.S.C. § 1102(a). Undisputed Facts.

2.    Both plans are "defined benefit"[4] as well as "pension benefit plans" within the meaning of ERISA §§ 3(2), 23(A), 35, 29 U.S.C. §§ 1002(2), 23(A), 35. However, the top hat plan, as its title suggests, provides post-retirement income for a limited number of senior executives such as plaintiffs. The pension plan qualifies for favorable tax treatment under the Internal Revenue Code, 26 U.S.C. § 401; the top hat plan does not.[5] Undisputed Facts, as applicable.

---

[3] ERISA's "anti-cutback rule": a one-time lump sum distribution of pension plan benefits "shall be the actuarial equivalent" of the accrued benefit in the form of a single-life annuity, ERISA § 204(c)(3), 29 U.S.C. § 1054(c)(3), and the "accrued benefit of a participant under a plan may not be decreased by an amendment of the plan . . . ." ERISA § 204(g), 29 U.S.C. § 1054(g). If a participant elects lump sum payment of pension plan benefits, the right to receive accrued pension plan COLAs may not be reduced by an employer's subsequent amendment of a plan.

[4] ERISA defines "accrued benefit" as "in the case of a defined benefit plan, the individual's accrued benefit determined under the plan . . . expressed in the form of an annual benefit commencing at normal retirement age." ERISA § 3(23)(A), 29 U.S.C. § 1002(23)(A).

[5] Top hat plans allow an employee to defer receipt of a portion of compensation until retirement, when the employee may be in a lower tax bracket, reducing the amount of taxes to be paid until actual receipt of the deferred amount. IT Group, 448 F.3d at 664-65.

3

3.      Under both plans, a participant, upon retirement, may elect to receive a monthly annuity or a lump sum representing the annuity's present value.  See Article 7.2.2 of the 1999 top hat plan, pls. mot., Ex. 1, doc. no. 39-1 at 14; Articles 7.1.1 and 6.1 of the pension plan, pls. mot., Ex. 2, doc. no. 39-2 at 20, 22; Articles 10.2, 10.2.3.3 of the 1999 top hat plan, doc. no. 39-1 at 18-19; Articles 10.1, 10.1. 4 of the pension plan, doc. no. 39-2 at 28.  See also Undisputed Facts.

4.      Both plans require the forms of payment to be actuarial equivalents.  Articles 10.2, 10.2.3 (lump sum) of the 1999 top hat plan, doc. no. 39-1 at 18-19; Articles 10.1, 10.1.4 (lump sum) of the pension plan, doc. no. 39-2 at 28-29.

5.      Each plan treated COLAs differently.  As to monthly benefits paid by annuity, the pension plan originally added a COLA to be calculated and distributed annually.  Pls. Undisputed Facts, ¶ 43.  As to lump sum benefits, the pension plan did not contain an actuarial equivalent for annual COLAs.  Id. ¶ 44.  In 2008, however, the pension plan was amended to include COLA benefits for both forms of payment.[6]  Id. ¶¶ 46, 47.  Top hat participants could elect to receive a monthly annuity with the added benefit of an annual COLA or a lump sum without COLAs.  Undisputed Facts.

---

[6]  The pension plan was amended because of *Williams v. Rohm and Haas Pension Plan*, 497 F.3d 710, 712 (7th Cir. 2007) (plan violated ERISA by denying COLAs for lump sum payments because COLAs were an accrued benefit).  Defendants:  "factual and legal changes occurred that required a mathematical computation change for calculating lump sum payments after the Pension Plan COLA amendment was adopted."  Undisputed Facts.

6.     Under both plans, COLAs were distributed each March subsequent to retirement in amounts "equal to the percentage increase in the United States Consumer Price Index for Urban Wage Earners and Clerical Workers . . . from the previous December to the December of the year immediately preceding such March 31 adjustment date," and the adjustment in any year was not "greater than 3%."  See Article XI of the 1999 top hat plan, pls. mot., Ex. 1, doc. no. 39-1 at 21; Article XIII of the pension plan, pls. mot., Ex. 2, doc. no. 39-2 at 34-35.  See also Undisputed Facts.

7.     When plaintiff Zebrowski retired effective December 1, 2006, at age 60, he elected lump sum payments of his retirement benefits under each plan.  Undisputed Facts. At that time, the pension plan included COLAs only if the participant elected a monthly annuity.  As a result, Zebrowski's pension plan lump sum did not include COLA benefits. Undisputed Facts.

8.     However, about two years after Zebrowski retired, the pension plan was amended to allow retroactive COLAs for lump sum payments of benefits earned before December 31, 2008.  Answer ¶ 23, doc. no. 18; Schedule F to the 2008 restated pension plan, COLA provisions, doc. no. 4-3 at 42.  Undisputed Facts.

9.     During the year following the amendment, plaintiffs Woodruff and Bialy also retired.  They elected lump sum payments of their retirement benefits.  When plaintiff Woodruff retired effective April 1, 2009, at age 62, and plaintiff Bialy retired effective December 1, 2009, at age 62, the pension plan allowed COLAs for lump sum payments. Undisputed Facts.

5

10.     Article VIII of the 1999 top hat plan document:

> A Participant shall vest in his percentage of his Basic Amount of Normal or
> Early Retirement Pension in accordance with this Article VIII.  A Participant
> shall be 100% vested in his Basic Amount of Normal or Early Retirement
> Pension when he is credited with 60 months of Benefit Service.

Doc. no. 39-1 at 16.

11.     Also, Article XV of the 1999 top hat plan document, entitled "Administration

of the Plan," in part:

> Subject to the terms of the Plan, the decision of the Administrative Committee
> upon any question of fact, interpretation, definition or procedure relating to the
> administration of the Plan shall be conclusive.  The responsibilities of the
> Administrative Committee shall include the following:
>
> * * * *
>
> 15.2.3.  Interpreting the provisions of the Plan in all particulars;
>
> 15.2.4.  Establishing and publishing rules and regulations for carrying out the
> Plan  . . . .

Article 15.2, doc. no. 39-1 at 25.

12.     In addition, Article XVI of the 1999 top hat plan document, entitled "Future

of the Plan," provides:

> The Company hopes and expects to continue the Plan indefinitely, but
> necessarily reserves the right at any time to reduce, suspend or discontinue
> payments to be made by it as provided hereunder.  The Company reserves the
> right to amend or discontinue the Plan at any time.

Doc. no. 39-1 at 27.

13.     All of plaintiffs' top hat benefits at issue in this litigation were "earned and

vested" within the meaning of Article VIII of the 1999 top hat plan no later than July 1, 2004.

6

Article VIII of 1999 top hat plan, doc. no. 39-1 at 16.[7]   Answer ¶¶ 7, 55, 72; Undisputed

Facts.

      14.     By resolution dated December 19, 2007, the defendant Committee approved

"key decisions and recommendations" effective January 1, 2005 for the top hat plan,

including:

> Non-qualified [top hat plan] benefits are reduced by qualified [pension plan]
> benefits, but are not linked to elections under the qualified [pension plan].

> Benefits accrued and vested as of December 31, 2004 will be grandfathered,
> and will remain subject to the rules described above.

Action of the Committee dated December 19, 2007, pls. mot., Ex. 4, doc. no. 39-4 at 2-4.

Undisputed Facts.  See id. at ¶ 40 (defendants representative's testimony:  benefits were

"earned and vested as of that date"); see also id. ¶ 3 ("in or around December 2007, the

Committee assumed administrative responsibility for and authority over" the top hat plan).

      15.     Article II of the 1999 top hat plan document defines certain terms, which apply

"unless a different meaning is clearly required by the context," including the following terms:

> 2.7  "Basic Amount of Early Retirement Pension" means the pension benefit
> to which a Participant is entitled at his Early Retirement Date.

> 2.8  "Basic Amount of Normal Retirement Pension" means the pension benefit
> to which a Participant is entitled at his Normal Retirement Date.

Doc. no. 39-1 at 5-6 (emphasis in original).

---

[7]  "In plaintiffs' case[s], all of their Supplement Plan benefits were derived from their pre-2005 Grandfathered Benefits."  Pls. reply br., doc. no. 41 at 15.

16.   Article VII of the 1999 top hat plan document, "Basic Amount of Early

Retirement Pension":

> 7.1  The Basic Amount of Early Retirement Pension shall be computed in accordance with this Article VII based on a Participant's Basic Earnings Rate and Benefit Service as of the Determination Date.

> 7.2   Subject to Article VIII, the Basic Amount of Early Retirement Pension payable to a Participant who separates from service with the Company on an Early Retirement Date shall be determined as follows:
>
> * * *
>
> 7.2.2.  The Basic Amount of Early Retirement Pension of a Participant . . . who retires from the Company . . . on or after age 60 shall be one-twelfth of (A - B) x C:

> > **A** equals 1.5% of the sum of the Participant's Basic Earnings Rate and his Award Program Adjustment, minus 0.35% of the Participant's Final Average Compensation; multiplied by the number of completed years and any fractional parts thereof of Benefit Service up to a maximum of 44 years.  This amount shall be calculated without application of Section 415 or Section 401(a)(17) of the Code.

> > **B** equals the monthly[8] Basic Amount of Normal Retirement Pension Benefits to which the Participant is entitled from the Pension Plan[9] plus any Statutory Benefits to which the Employee may be entitled; and

> > **C** equals the percentage (not to exceed 1.0) determined by dividing the number of months in the 10 year period preceding the Determination Date that the Participant was an executive career band level or greater by 60.

Doc. no. 39-1 at 14.

---

[8]  The parties agree that "monthly" should be deleted as "scrivener's error" because Article 7.2.2 refers to "one-twelfth" of the value resulting from the calculation.  Undisputed Facts.

[9]  "'<u>Pension Plan</u>' means the RohMax USA, Inc. Pension Plan, as amended from time to time." Article 2.30 of the 1999 top hat plan, doc. no. 39-1 at 3 (emphasis in original).

17.     As the parties agree, Article VII of the 1999 top hat plan document contains a "mandatory" formula for calculating benefits.  Undisputed Facts.  Also, the formula is "clear" and "neither the benefit formula nor defined terms set forth in the plan could be altered by the plan administrator or actuary."  Pls. Undisputed Facts, ¶ 24.

18.     On December 30, 2008, the Committee signed a "restatement" of the 1999 top hat plan retroactively "effective to January 1, 2005."  Pls. Undisputed Facts, ¶¶ 51-53.  Any amendments that were incorporated into the 2008 restated plan  "did not change, alter, or modify" the plan's benefit formula.[10]  Id., ¶ 53.

19.     Section 13 of the 2008 restated top hat plan amended Article XVI of the 1999 top hat plan document, "Future of the Plan," provides as follows:

> The Company hopes and expects to continue the Plan indefinitely, but necessarily reserves the right at any time to reduce, suspend or discontinue payments to be made by it as provided hereunder.  The Company reserves the right to amend or discontinue the Plan at any time, provided that any amendment or termination of the Plan shall comply with the restrictions of Section 409A of the Code. . . .

Pls. mot., Ex. 3, doc. no. 39-3 at 35; defs. mot., Ex. 3, doc. no. 36-3 at 35.

---

[10]  In the 2008 top hat plan, the formula was renumbered, "Section 6, Amount of Early Retirement Pension," and the following sentence was added at the end of the formula's factor "B":

> . . . provided that the Participant's Basic Amount of Early Retirement Pension shall reflect the relative value of the Participant's selected payment form under the Pension Plan.

2008 restated top hat plan, Section 6.1(b)(ii), pls. mot., Ex. 3, doc. no. 39-3 at 18.  For different reasons, the parties agree that this language is not material to the calculation of plaintiffs' benefits.  Pls. Undisputed Facts, ¶¶ 54, 84; defs. Undisputed Facts, ¶ 81 ("amendment only clarified the Pension Plan Offset and did not change the calculation in any way").  See also id., ¶¶ 39-40 (a "clarifying amendment" and "the benefit formula did not change before or after the adoption of the [2008 restated top hat plan]"); pls. reply br., doc. no. 41 at 20 & n.1 ("relative value" of a lump sum and annuity would not change the value of factor B for any plaintiff).

20.    In addition, Section 14.1 of the 2008 restated top hat plan, "General Provisions" – "Administration," provides in part:

> The administration of the Plan, the exclusive and discretionary power to interpret its provisions, to make factual determinations thereunder, to construe any ambiguous provisions and to establish rules and regulations for its administration, and the responsibility for carrying out its provisions are vested in the Administrative Committee.  With respect to Grandfathered Benefits, the Administrative Committee shall have all authority granted to the administrator under the provisions of the Plan in effect prior to January 1, 2005, including the authority to verify all procedures by which payments to Participants are authorized.  Any interpretation of the Plan by the Administrative Committee, any decision on any matter within the discretion of the Administrative Committee, and any administrative act by the Administrative Committee shall be final and binding on all Participants and Beneficiaries. . . . A Participant or his beneficiary shall be entitled to Plan benefits only if the Administrative Committee, in its discretion, determines that the Participant or Beneficiary is entitled to them.

Doc. no. 39-3 at 36; doc. no. 36-3 at 36.

21.    Section 2.25 of the 2008 restated top hat plan provides that "Grandfathered Benefit"

> means that portion of a Participant's Plan benefit that was earned and vested as of December 31, 2004, determined under the provisions of the Plan then in effect, and adjusted in accordance with Section 409A of the Code. Notwithstanding the foregoing, a Participant's Grandfathered Benefit as of any Determination Date shall not exceed his total Plan benefit as defined in Sections 5 [normal retirement pension] and 6 [early retirement pension].

Doc. no. 39-3 at 11; doc. no. 36-3 at 11.

22.    Factor B of the formula set forth in Article 7.2.2 of the 1999 top hat plan document – "B" "equals the . . . Basic Amount of Normal Retirement Pension Benefits to which the Participant is entitled from the Pension Plan" – incorporates by reference the benefits formula specified by Article VI of the pension plan.  Undisputed Facts.

10

23.     Article VI of the pension plan provides:

6.1 [T]he monthly Basic Amount of Normal Retirement Pension shall
be 1/12th of:

6.1.1.   1.5% of the Participant's Basic Earnings Rate
minus 0.35% of the Participant's Final Average Compensation
multiplied by the number of completed years and any fractional
parts thereof of Benefit Service up to a maximum of 44 years;
plus

6.1.2.   0.75% of the Participant's Basic Earnings Rate
multiplied by the number of completed years and any fractional
parts thereof of Benefit Service in excess of 44 years.

Doc. no. 39-2 at 20; see Article 7.1.1 of the pension plan ("the Basic Amount of Early

Retirement Pension shall be computed in accordance with Article VI . . . ."), doc. no. 39-2

at 22. See also pls. Undisputed Facts (defs. Response, ¶ 27:  "Article VI . . . contains the

Pension Plan's provisions related to the Basic Amount of Normal Retirement Pension").

24.     Under Article II of the pension plan document's definitions of certain terms,

which apply "unless a different meaning is clearly required by the context":

2.1  "Accrued Benefit" means the portion of a Participant's Basic Amount of
Normal Retirement Pension, expressed in terms of a monthly single life
annuity beginning at or after his Normal Retirement Date, that has accrued as
of any determination date in accordance with Article VI.

Doc. no. 39-2 at 8 (emphasis in original).

25.     As also agreed, using the formula set forth in Article 7.2.2 of the 1999 top hat

plan document, or the formula set forth in Section 6.1 of the 2008 restated top hat plan

document, plaintiffs' benefits amounted to "one-twelfth of (A minus B) x C."  Pls.

Undisputed Facts, ¶ 20.  This translates as follows:  "A" is the annual annuity amount of all

11

regular and bonus compensation paid in excess of Internal Revenue Code limits for qualified plans; "B" is the annual annuity amount of benefits payable under the tax-qualified pension plan; and "C" is "a factor measuring the number of years among the preceding ten years during which the participant occupied a certain career band, with a minimum of five years (60 months) required to receive 100% of the calculated benefits."  Id.; see also id., ¶¶ 5-6. As agreed, the multiplier factor C for each plaintiff was 1.0.  Id., ¶ 20; defs. Undisputed Facts, ¶ 24.  Multiplying the result  of "(A minus B) x C" by "one-twelfth" produces a monthly benefit amount.[11]

26.    During the decade prior to 2008, administrators of the pension and top hat plans calculated monthly annuity amounts for factors A and B that did not include COLAs. Under the compensation structure specified in both the 1999 and the 2008 restated top hat plan documents, "B" is the amount of benefits payable under the pension plan expressed in an annual (monthly) annuity amount.

27.    The Committee's actuaries used a different methodology to calculate benefits, with factor A expressing the "total retirement benefit" and factor B expressing the "total pension benefit" to which a participant was entitled, including COLAs, "due to changes in

---

[11] The parties and their representatives use an equivalent, alternative computation expressing factors A and B as monthly annuities, with the net resulting difference between the two factors being treated as a monthly annuity, convertible to an optional form of payment, such as a lump sum  benefit.  See, e.g., pls. Undisputed Facts, ¶¶ 23, 33-36; defs. Undisputed Facts, ¶ 54; pls. br., doc. no. 38-2 at 11; pls. reply br., doc. no. 41 at 11, 24 ("[t]he monthly (or annual, depending on when the 'one twelfth' multiplication occurs)."

the law and facts in 2008."[12]  Pls. Undisputed Facts, ¶¶ 37, 79; see defs. br., doc. no. 42 at

13 ("the methodology underlying the [top hat plan's] calculation formula was changed after

the adoption of the 2008 Pension Plan COLA amendment").

28.     The Committee incorrectly decided plaintiff Zebrowski was overpaid his top

hat lump sum by an amount equal to the COLA shortfall on his pension plan lump sum.  Its

calculation mistakenly required him to repay the top hat plan $461,775 in order to receive the

same amount in COLA benefits from the pension plan.

29.     Plaintiff Zebrowski did not comply with the Committee's demand to repay the

top hat plan, and defendants did not pay him the COLAs due on his pension plan lump sum.

30.     As to plaintiffs Woodruff and Bialy, the Committee agreed to pay pension plan

COLAs, but improperly reduced their top hat lump sums by an amount equal to their pension

plan COLAs –  $429,957 as to Woodruff and $266,470 as to Bialy.

## II.  Discussion

Part of the purpose of ERISA was to ensure that "'if a worker has been promised a

defined pension benefit upon retirement – and if he has fulfilled whatever conditions are

required to obtain a vested benefit – he will actually receive it.'"  Lockheed Corp. v. Spink,

517 U.S. 882, 887 (1996) (quoting Nachman Corp. v. Pension Benefit Guar. Corp., 446 U.S.

359, 375 (1980)).  Unless ERISA contains a contrary directive, the benefit plan must be

enforced as written.  Shaver v. Siemens Corp., 670 F.3d 462, 470 (3d Cir. 2012).

---

[12] In defendants' view, "[t]he  legal changes necessitating this change resulted from the *Williams v. Rohm and Haas Pension Plan* litigation . . . ."  Defs. br., doc. no. 42 at 13.

A top hat plan is "a unique animal under ERISA's provisions." Goldstein v. Johnson & Johnson, 251 F.3d 433, 436, 442 (3d Cir. 2001); In re IT Group Inc., 448 F.3d 661, 664 (3d Cir. 2006) (top hat plans "are subject to ERISA's administrative and enforcement provisions, but exempt from the substantive provisions that regulate plan funding and impose fiduciary duties"). These plans "are more appropriately considered as unilateral contracts, whereby neither party's interpretation is entitled to any more 'deference' than the other party's." Goldstein, 251 F.3d at 436 (citing In re New Valley Corp., 89 F.3d 143, 149 (3d Cir. 1996)); Kemmerer v. ICI Americas Inc., 70 F.3d 281, 287 (3d Cir. 1995) ("plan constitutes an offer that the employee, by participating in the plan, electing a distributive scheme, and serving the employer for the requisite number of years, accepts by performance").

Although degrees of discretion may be written into a top hat plan document, as was done here, they do "not act as a legal trigger altering the standard of review." Goldstein, 251 F.3d at 443. Under ordinary contract law principles, that discretion must be exercised subject to the implied duty of good faith and fair dealing: "a requirement that includes the duty to exercise the discretion reasonably." Id. at 436, 444 ("any grant of discretion must be given effect as part of the unilateral contract itself"). "As with any other contract term, courts retain the authority to conduct a de novo review as to whether a party has complied with its good faith obligations." Id. at 443.

Here, the pension and top hats plans were designed to work in concert with each other. The top hat plan paid benefits on salary and other remuneration that could not be paid from

the pension plan because of its cap on pensionable compensation.  Unlike the pension plan, however, the top hat plan was not funded – its benefits were payable directly from a company's general assets and operating revenues.

Inasmuch as the top hat plan is a contract that potentially affects pension rights protected by ERISA, it is "'subject to interpretation in accordance with tenets of federal common law.'"  Shaver, 670 F.3d at 496 n.28 (quoting Smart v. Gillette Co. v. Long-Term Disability Plan, 70 F.3d 173, 178 (1st Cir. 1995) (citing Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 56 (1987)); Baldwin v. Univ. of Pittsburgh Med. Ctr., 636 F.3d 69, 75 (3d Cir. 2011) ("[c]laims for benefits based on the terms of an ERISA plan are contractual in nature and are governed by federal common law contract principles"); New Valley, 89 F.3d at 148-49 (top hat plans are governed by "general principles" of "the federal common law of contract"); Kemmerer, 70 F.3d at 287 (top hat plans are governed by "breach of contract principles, applied as a matter of federal common law").

A basic principle of contract construction is that unambiguous agreements must be interpreted and enforced according to their terms.  Shaver, 670 F.3d at 496.  Whether terms in an ERISA plan document are ambiguous is, initially, a question of law.  Baldwin, 636 F.3d at 76 (citing Mellon Bank, N.A. v. Aetna Bus. Credit Inc., 619 F.2d 1001, 1011 (3d Cir. 1980) (Cahn, J., sitting by designation)).  If the terms "are capable of more than one objectively reasonable interpretation, the words are ambiguous." Id. To determinate whether terms are clear or ambiguous, "a court must consider 'the words of the contract, the

15

alternative meaning suggested by counsel, and the nature of the objective evidence to be offered in support of that meaning.'" Id. (quoting Mellon Bank, 619 F.2d at 1011)); New Valley, 89 F.3d at 150 (a court is required to "hear the proffer of the parties and consider extrinsic evidence to determine whether there is an ambiguity").

The objective indicia of the parties' intent may include "'the structure of the contract" and "the conduct of the parties that reflects their understanding of the contract's meaning.'" Baldwin, 636 F.3d at 76 (quoting New Valley, 89 F.3d at 150). "Evidence of a course of conduct is particularly compelling when it occurs over a substantial time period." Teamsters Indus. Emp. Welfare Fund v. Rolls-Royce Motor Cars, Inc., 989 F.2d 132, 137 (3d Cir. 1993) (citing Old Colony Trust Co. v. City of Omaha, 230 U.S. 100, 118 (1913) ("the practical interpretation of a contract by the parties to it for any considerable period of time before it comes to be the subject of controversy is deemed of great, if not controlling, influence"). See also Restatement (Second) of Contracts § 223(2) (1981) ("course of dealing between the parties gives meaning to . . . their agreement"); id. § 223 cmt. b ("no requirement that an agreement be ambiguous before evidence of a course of conduct can be shown").

Plaintiffs contend that under Article VIII of the 1999 top hat plan, their benefits were earned, vested, and irrevocable no later than July 1, 2004. There is no genuine dispute that Article VIII's terms are clear – long years of service to the company qualified each plaintiff as "100% vested" in his top hat benefits within the plain meaning of Article VIII. However, defendants assert that both the 1999 and 2008 plan documents granted the Committee broad

discretion to amend and even terminate those benefits at any time.  They deny that plaintiffs'

benefits "vested," asserting that the Committee's discretion permitted it to reduce or

terminate the benefits for any reason.

So expressed, the Committee's position "has no basis in contract law" and is "more

than minimally unfair."  <u>See</u> <u>Kemmerer</u>, 70 F.3d at 287 (rejecting analogous argument).

ERISA administrators commonly "have various degrees of responsibility, depending on the

plan's design," <u>Goldstein</u>, 251 F.3d at 441, but they do not have "unfettered discretion" to

interpret plan terms:

> If the terms are unambiguous, then any actions taken by the plan administrator
> inconsistent  with  the  terms  of  the  document  are  arbitrary.    But  actions
> reasonably consistent with unambiguous plan language are not arbitrary.  If the
> reviewing court determines the terms of a plan document are ambiguous, it
> must take the additional step and analyze whether the plan administrator's
> interpretation of the document is reasonable.

<u>Funk v. CIGNA Grp. Ins.</u>, 648 F.3d 182, 191-92 (3d Cir. 2011) (quoting <u>Bill Gray Enters.,</u>

<u>Inc. Emp. Health & Welfare Plan v. Gourley</u>, 248 F.3d 206, 218 (3d Cir. 2001)).

In its terms and context and given all the contractual circumstances, Article VIII is not

ambiguous.  According to its plain wording, plaintiffs' benefits vested under the 1999 top

hat plan document by July 1, 2004.  The remaining question is whether the Committee's

claim of  discretion to nullify plaintiffs' entitlement to benefits is consistent with the clear

meaning of Article VIII.  "Under unilateral contract principles, once the employee performs,

the offer is irrevocable, the contract is completed, and the employer is required to comply

with its side of the bargain."  <u>Kemmerer</u>, 70 F.3d at 287.  As our Court of Appeals has

explained:

> even when a plan reserves to the sponsor an explicit right to terminate the plan, acceptance by performance closes that door under unilateral contract principles (unless an explicit right to terminate or amend after the participant's performance is reserved). "Any other interpretation . . . would make the Plan's several specific and mandatory provisions ineffective, rendering the promises embodied therein completely illusory."

Id., 70 F.3d at 287-88 (quoting Carr v. First Nationwide Bank, 816 F. Supp. 1476, 1494 (N.D. Cal. 1993)).  Giving effect to the top hat contract, including those terms conferring discretion on the administrator, plaintiffs' benefits vested in 2004 under the 1999 top hat plan document irrevocably – i.e., some four years before the Committee implemented the challenged method of calculating top hat benefits.

Nothing suggests that the 1999 or the 2008 top hat plan document reserves a right to amend or terminate benefits after a participant's performance.  Article XVI of the 1999 top hat plan states that the "Company . . . reserves the right at any time to reduce, suspend or discontinue payments to be made by it . . . ."  Section 13 of the 2008 top hat plan contains the same reservation and also states that the "Company . . . reserves the right to amend or discontinue the Plan at any time . . . ."  The phrase, "at any time," is not compatible with a top hat plan.  New Valley, 89 F.3d at 151 (top hat plan participants' "reasonable alternative interpretation of 'at any time' (until performance)," rendered the phrase ambiguous).  If the Committee "desired to clearly indicate its ability to terminate benefits even after performance, in the face of likely expectations to the contrary, it could have simply added the words 'including after [performance]' to the plan."  Id.

18

As both sides agree, the terms of the formula for calculating top hat benefits are clear and result in an undisputed monthly annuity.  Indeed, defendants acknowledge that plaintiffs' benefits were initially computed as annuities for factors A and B.  However, as to the remainder of the calculation, the parties reach radically divergent  conclusions.

Defendants interpolate and read into the top hat formula, in hindsight, a "total retirement benefit."  See, e.g., defs. br., doc. no. 42 at 4-5, 23, 30.  A representative example of defendants' position is that the operation of factors A and B "specify the total amount of employer-provided pension benefits a plan sponsor wishes to provide from both plans," and "[b]y incorporating the pension plan offset [factor B], the Company here sought to ensure that the same benefits were not paid to participants twice."  Id. at 30 (once under the pension plan and again under the top hat plan).  In addition, factor B is viewed as "the total pension plan benefit a participant receives," including accrued pension plan COLAs.  Id. at 4-5, 23, 30.

However, the terms "total retirement benefit" or "total pension plan benefit a participant receives" are not to be found in either the pension plan or the top hat plan documents, and neither factor A nor B refers to COLAs.  The plans are devoid of any language that a reasonable plan participant would understand to mean that the top hat plan document sets an overall limit or cap on all accrued pension and top hat benefits combined. Instead, the plain language of factor A provides an annuity amount for all regular and bonus compensation without application of Internal Revenue Code requirements for tax-qualified

19

pension plans.  Consequently, the appendages "total retirement benefit" and "total pension benefit" are forced overlays and afterthoughts not supported by a plain reading of the plans.

Defendants also read strained constructions into factor B.  The Committee, apparently, has always interpreted factor B to include the total "pension benefit to which a participant is entitled," as defined by Articles 2.7 and 2.8 of the 1999 top hat plan (respectively, the basic amount of early and normal retirement pensions).  While they insist their understanding did not change, they acknowledge that the method for calculating factor B was redefined to accommodate the holding of <u>Williams v. Rohm and Haas Pension Plan</u>, 497 F.3d 710, 712 (7th Cir. 2007) (COLAs for pension plan lump sum payments are accrued benefits).  Given <u>Williams</u>, they assert that the calculation of factor B must include the value of pension plan COLAs because COLAs are accrued benefits to which a participant is entitled.  <u>See</u>, <u>e.g.</u>, defs. br., doc. no. 42 at 13.

As to the meaning of factor B, "the objective manifestations of intent, rather than the unknowable subjective intent of the parties, governs this inquiry."  <u>Teamsters</u>, 989 F.2d at 137.  Defendants' position ignores the structure of both plans, which provides COLAs in sections that are separate and distinct from those setting forth the formulas for calculation of benefits.  Although COLAs are accrued benefits, a  plain reading of the pension plan COLA provisions does not reasonably suggest that COLAs should be included in the calculation of monthly annuity amounts.  Moreover, there is no dispute that COLAs historically were computed annually and paid as additions to – not as deductions from – the monthly pension annuities.

20

The Committee is mistaken that Article 2.7 alone controls the pension benefits determination – Article 2.7 generally defines a participant's entitlement to a basic amount of retirement pension, without detailing how the benefits are to be calculated. The specifics are set forth in Article VII of the 1999 top hat plan document, which delineates the formula for calculating the "Basic Amount of Early Retirement Pension." In particular, Article 7.2.2 provides that "B equals the monthly Basic Amount of Normal Retirement Pension Benefits to which the Participant is entitled from the Pension Plan." This statement unambiguously and unmistakably refers to the pension plan. Article VI of the pension plan, entitled "Basic Amount of Normal Retirement Pension," explicitly provides the terms. Article 6.1 of the pension plan supplies the specific formula to calculate the pension benefit to produce an annuity for factor B of the top hat plan formula. In the event a participant elected early retirement, as each plaintiff did here, Article 7.1.1 of the pension plan states that the basic amount of early retirement pension also shall be computed under Article 6.1.

The Committee would eliminate the top hat plan's express incorporation of Article VI of the pension plan for the calculation of benefits under Article 7.2.2. In lieu of Article 6.1, the Committee has substituted its theory that factor B defines  a "total pension plan benefit" that includes accrued pension plan COLAs. This interpretation departs from the unambiguous terms of the top hat plan and renders meaningless the phrase in Article 7.2.2, "the monthly Basic Amount of Normal Retirement Pension Benefits to which the Participant is entitled from the Pension Plan."

Both plans' provisions – Articles 2.7 and 7.2.2 of the top hat plan and Article 6.1 of the pension plan – apply to the calculation of plaintiffs' benefits. They simply have different functions. Article 2.7 is a general grant of entitlement to a basic amount of early retirement pension under the top hat plan document. Factor B in Article 7.2.2 is the annuity amount calculated under Article 6.1 of the pension plan. A straightforward reading of the plans reveals that pension plan COLAs are added annually to the pension plan annuity or paid in a one-time actuarially equivalent lump sum payment and are not included in the formula, "one-twelfth of (A - B) x C."

Importantly, a "contract must be interpreted in light of the meaning which the parties have accorded to it as evidenced by their conduct in its performance." Capitol Bus Co. v. Blue Bird Coach Lines, Inc., 478 F.2d 556, 560 (3d Cir. 1973). For nearly a decade while the 1999 top hat plan was in place, the Committee did not include COLAs in the calculation of top hat plan benefits. Indeed, defendants acknowledge that the calculation of plaintiff's benefits departed from the Committee's longstanding administration of the plans. Here, the actions of the contracting parties were consistent with a mutual intention that pension plan COLAs would be paid once under the pension plan and would not be used to reduce benefits paid under the top hat plan.

Although the Committee apparently determined that facts and legal developments outside the four corners of the plans required the adoption of a new method of calculating benefits in order to preserve the company's general assets, those circumstances do not vary

22

the parties' mutual intent as evidenced by the terms of the pension plan and the 1999 top hat plan.  Plaintiffs were promised a defined pension benefit upon retirement – and they fulfilled the conditions required to obtain their vested benefits.  As a result, they are entitled to receive the benefits as promised.

Voluminous extrinsic evidence has been submitted, including conflicting opinions by the parties' experts and representatives.  Careful review of the documentary evidence and deposition testimony does not disclose any ambiguity in the language of the plans' definitions and benefits formulas.  A "contract is not rendered ambiguous by the mere fact that the parties do not agree on the proper construction."  Duquesne Light Co. v. Westinghouse Elec. Corp., 66 F.3d 604, 614 (3d Cir. 1995).  Here, the record compels the conclusion that the Committee utilized an approach that was not reasonably consistent with the clear and unambiguous terms of the plans.  Moreover, it contradicted prior administration of the plans over a substantial time period.  As evidenced by the parties' course of conduct, the plans by their very terms do not support the Committee's calculation of benefits.  Plaintiffs were improperly deprived of their top hat pensions.

The Committee's benefits determination also violated ERISA's "anti-cutback rule," ERISA § 204(g), 29 U.S.C. § 1054(g), which "'prohibits an employer from decreasing or eliminating a participant's accrued benefits by plan amendment.'"  Shaver, 670 F.3d at 472 (quoting Bellas v. CBS, Inc., 221 F.3d 517, 522 (3d Cir. 2000)).  The Committee's interpretation constructively amended the pension plan by conditioning receipt of COLAs

for the lump sum pension plan benefit on non-receipt of a significant portion of top hat benefits, thereby reducing the value of accrued and protected pension plan benefits – the COLAs.

Defendants say there can be no cut-back violation because there was no amendment to the pension plan.  However, the Committee's interpretation had the same effect as a formal amendment.  Battoni v. IBEW Local Union No. 102 Emp. Pension Plan made it clear that "even when there is 'no evidence in the record that the actual text of the [pension plan] was amended or modified in any way,' a mere 'erroneous interpretation of a plan provision that results in the improper denial of benefits to a plan participant may be construed as an 'amendment' for the purposes of [the anti-cutback rule].'"  594 F.3d 230, 234-35 & n.3 (3d Cir. 2010) (quoting Hein v. FDIC, 88 F.3d 210, 216 (3d Cir. 1996).

Defendants also would apply the no cut-back rule to the pension plan, but not to the top hat plan.  They assert that the two plans are entirely separate, and plaintiffs did not lose any pension plan benefits.  However, the rule "cannot be employed in such an overly simplistic, robotic fashion."  Battoni, 594 F.3d at 234, 235 (quoting Cent. Laborers' Pension Fund v. Heinz, 541 U.S. 739, 746 (2004) (("at the moment the new condition is imposed, the accrued benefit becomes less valuable").  Here, what the Committee gave with one hand, it took away with the other.  Its actions stripped plaintiffs of the benefit of their bargain – COLAs on the lump sum pension plan and the full value of the defined top hat pension benefit upon retirement.

Defendants also say that the Committee's interpretation of the top hat plan does not violate its fiduciary duties under the pension plan.  However, the Committee acted as a fiduciary as for both plans.  See Goldstein, 251 F.3d at 443 (ERISA defines "fiduciary" as one who exercises discretion in interpreting the terms of a plan (citing ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) ("a person is a fiduciary with respect to a plan to the extent . . . (i) he exercises any discretionary authority or discretionary control respecting management of such plan . . . or (iii) he has any discretionary authority or discretionary responsibility in the administration of the plan")).  The Committee did not discharge its fiduciary duties as to both plans.  See Goldstein, 251 F.3d at 436 (the implied duty of good faith and fair dealing – "a requirement that includes the duty to exercise the discretion reasonably"); ERISA § 404(a)(1)(A)(i), (B), (D), 29 U.S.C. § 1104(a)(1)(A)(i), (B), (D) ("a fiduciary shall discharge his duties . . . for the exclusive purpose of:  providing benefits to participants and their beneficiaries; and . . . with the care, skill, prudence, and diligence . . . [of] a prudent man . . . in accordance with the documents and instruments governing the plan").

BY THE COURT:

/s/  Edmund V. Ludwig
 Edmund V. Ludwig, J.

25